Filed 8/27/13  In re J.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057918 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120559) |
| v. | OPINION |
| H.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Carole A. Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Father appeals an order denying his petition brought under Welfare and Institutions Code section 388[1] and from a judgment terminating parental rights. Father contends the trial court erred in denying his section 388 petition because his circumstances had changed and his bond with his son, J.P., was strong. Father also argues the juvenile court erred in rejecting the beneficial parent-child relationship exception to terminating parental rights under section 366.26, subdivision (c)(1)(B)(i).

We conclude the juvenile court did not err in denying father's section 388 petition because there were not sufficient changed circumstances and granting the petition was not in J.P.'s best interests. We also conclude the juvenile court did not err in rejecting the parent-child relationship exception.

II

FACTS AND PROCEDURAL BACKGROUND

J.P.'s family first came to the attention of the DPSS in June 2009, when Riverside County Child Protective Services (CPS) received an Immediate Response referral founded on allegations of general neglect and failure to protect J.P. His family was offered voluntary family maintenance services but J.P.'s parents made minimal progress with service objectives and case plan goals.

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

In July 2010, at 8:00 a.m., law enforcement officials responded to several calls reporting a woman (mother) passed out in the front seat of a car, with a small child (J.P.) in the back seat. Officers found mother passed out in the car and J.P. asleep in the back seat. Mother appeared to be under the influence of a controlled substance and was incoherent. The officers found 20 bottles of prescription medications in mother's purse and loose Vicodin tablets.

There were additional referrals of neglect allegations on October 4, 2010, and October 12, 2010, in which mother reportedly allowed J.P. to play outside, unsupervised, in the yard at 3:00 a.m. and 4:00 a.m. A neighbor reported that mother appeared to be under the influence of controlled substances and incoherent.

On October 28, 2010, a social worker from the Department of Public Social Services (DPSS) made an unannounced visit to J.P.'s home and found mother under the influence of prescribed medication while alone with J.P. Mother was incoherent and had difficulty communicating. DPSS removed J.P. from his parents' home due to mother's substance abuse and father's failure to protect J.P. from harm.

On November 1, 2010, DPSS filed a juvenile dependency petition under section 300, subdivision (b), and later amended the petition. DPSS alleged in the petition and amended petition (referred to collectively as the petition) that, despite pre-placement preventative services, mother continued to abuse prescription medications while caring for J.P., and father continued to neglect J.P. Mother had prior arrests and convictions for drug-related offenses and for child endangerment. In addition, mother had mental health issues and failed to take her medications as prescribed. Father allegedly knew mother

3

was abusing prescription medications while caring for J.P. and nevertheless continued to leave J.P. in mother's care during father's absence.

According to the social worker's report attached to the juvenile dependency petition, mother was arrested for child endangerment in July 2010 (Pen. Code, § 273a), and for possession and being under the influence of controlled substances (Health & Saf. Code, §§ 11350, subd. (a), 11550, subd. (a)). Father had no criminal history. Mother was given referrals to substance abuse programs but failed to enroll. Mother and father signed a safety plan in July 2010. As part of the voluntary plan, father agreed not to allow J.P. to be unsupervised with mother but, on October 28, 2010, the DPSS found J.P. left in mother's sole care, unsupervised, with mother abusing prescription medications while caring for J.P.

**Detention Hearing**

At the detention hearing on November 2, 2010, the juvenile court ordered J.P. detained and removed from mother and father's care. The court ordered reunification services provided to both parents and authorized supervised visitation at least once a week.

**Jurisdiction/Disposition Hearing**

The social worker reported in the November 2010 jurisdiction/disposition hearing report that J.P. "appears bonded to his father." J.P. was father's only child. Father was employed full-time as a machinist. Mother was unemployed. Mother was diagnosed in 2007 with depression, panic disorder, and generalized anxiety. She was also diagnosed with Anxiety Disorder and prescribed medication in November 2010.

4

The social worker interviewed mother and father's neighbor, who said mother exhibited odd behavior. He assumed she abused drugs or had a mental health condition. She often babbled to herself, approached random people and yelled at them for no reason, peered through his windows, and leaned against his front door to listen to his conversations. The neighbor noticed father worked long hours, leaving early in the morning and returning home late at night. The family's three-year-old son was left alone with mother. They were quiet until after 11:00 p.m., when mother would play loud music and "entertain" J.P. outside between 2:00 a.m. and 4:00 a.m. Mother would talk or argue with herself, while J.P. played in the dark. The neighbor assumed father slept through the night while this was happening, since he did not emerge from his home until the morning.

DPSS concluded in its report that mother's substance abuse and inability to stabilize her mental health seriously impaired her ability to supervise, protect, and care for J.P. DPSS was also concerned that father was incapable of protecting J.P., because father justified mother's substance abuse and left J.P. in mother's care while at work. He also failed to intervene during mother and J.P.'s activities outside during the early morning hours. Mother and father reportedly continued to deny mother's abusive behaviors and failed to address mother's substance abuse.

During the jurisdiction/disposition hearing, the juvenile court sustained the petition allegations, declared J.P. a dependent, and ordered him removed from his parents' custody. The court ordered reunification services for mother and father, and authorized liberalized visitation, contingent upon parents' compliance with their case plans.

**Six-Month Review Hearing**

DPSS described father in the six-month hearing report as very supportive of mother and J.P. He helped mother understand things and was sympathetic to her mental health struggles. Father reportedly used his parenting skills and helped mother moderate overwhelming J.P. with hugs and crying about separating from J.P.

Father completed a parenting education course and participated in individual therapy. Mother and father participated consistently in two-hour, supervised visits with J.P. once a week, and the visits went well. J.P. seemed to look forward to the visits and enjoyed spending time with his parents.

DPSS recommended that J.P. not be returned to mother and father because mother and father continued to live together, father worked full time, and mother was unable to provide a safe home for J.P. because she remained mentally unstable and continued to abuse prescription medications. On April 20, 2011, mother was convicted of child endangerment (§ 273a, subd. (b)) and violating Vehicle Code section 23152, subdivision (a) (felony driving under the influence). She was sentenced to 36 months summary probation, to be served on weekends. During the June 1, 2011, six-month review hearing, the juvenile court found that mother and father had not completed their case plans. The court ordered reunification services continued and increased supervised visitation to one-hour visits twice a week.

**12-Month Review Hearing**

DPSS reported in the 12-month review report filed in November 2012, that mother continued to struggle with mental health issues and father continued to be supportive of

her and J.P.  Supervised visitation also continued to go well.  The social worker again reported that father "appears to be bonded with his son.  [J.P.] appears to be very comfortable and he enjoys playing with his father during visits."  The social worker nevertheless concluded that father "would not be able to protect and provide a safe and healthy home for [J.P.]" because he "works and would need to leave the child in the care of the mother who is unable to provide [] safe and adequate care."  Mother continued to minimize her part in the overall involvement of DPSS and remained in need of mental health services.  Father was mentally able to care for J.P. but continued to "enable" mother, and failed to protect J.P.  During the 12-month review hearing on May 29, 2011, the trial court ordered that J.P. remain in out-of-home placement, with continuation of reunification services.

**18-Month Review Hearing**

DPSS reported in the 18-month hearing report that mother and father were still living together.  Father continued to work long hours and support mother.  He was participating in individual therapy and had completed a parenting class.  Father still did not seem to comprehend that J.P.'s safety was at risk when he was left in mother's care.

Mother's relationship with J.P. was "strained or uncomfortable due to her smothering him with hugs and kisses during each visit," when J.P. was trying to play and converse.  Mother was referred for a psychiatric medication evaluation, which she failed to attend.  DPSS described father as "very passive and he appears to be very supportive of his wife.  [H]e helps her to understand and accept things that are difficult for her to

7

understand. [H]e appears understanding and sympathetic regarding her mental health struggles."

DPSS reported that father appeared to be bonded to J.P. and J.P. appeared to be very comfortable with him. Mother and father had not yet successfully completed their case plans or demonstrated benefiting from services. J.P. had adjusted to living with his foster family but his foster mother did not want long-term placement of J.P. with her. In March 2012, DPSS began looking for long-term placement of J.P.

Mother completed a substance abuse treatment program in October 2011. She also completed a 52-week child batter's treatment program, required for her criminal case. Mother did not appear for her scheduled drug test on November 3, 2011. She had multiple no-show notices for scheduled drug tests. Mother was in need of significant mental health treatment. She was unable to understand information relayed to her and unable to follow directions regarding obtaining court-ordered services. In March 2012, mother was discharged from counseling for lack of attendance. DPSS reported that it appeared that she was unable to benefit from any of the services.

DPSS was concerned that father would not be able to protect and provide a safe and healthy home for J.P. because mother and father lived together and mother had not addressed her mental health and substance abuse issues. Because J.P. would be at risk of harm if returned to mother and father's care, DPSS recommended terminating reunification services, setting a section 366.26 hearing, and authorizing visitation twice monthly.

8

At the 18-month review hearing on May 31, 2012, father submitted a letter from his employer of seven years, describing him as reliable, trustworthy, and devoted to his work and family. His therapist also provided a letter stating father had completed his course of therapy and met his therapy goals. Counsel for DPSS acknowledged father had completed his case plan but noted mother had not completed her plan. Mother therefore posed a serious risk to J.P. because she was living with father, she had serious psychiatric issues, and she was not following DPSS directives. Although father had indicated he would move out of the family home and have his sister provide daycare for J.P., father did not confirm he had done this. DPSS concluded father still lived with mother and therefore J.P. could not be safely returned to father.

Father's attorney told the court that father was willing to move out or have mother move out. Father's attorney also noted that J.P. was not currently placed in a prospective adoptive home. Father testified that he was willing to do anything to regain custody of J.P., including having mother move out of the family home and arrange for child care for J.P. Father said his sister could help him with child care for J.P. He claimed he had previously spoken to the social worker about separating from mother and having his sister provide day care for J.P. while father was working. Father told the court that, if J.P. was returned to him, he would probably move from Riverside to Fontana so that he would be closer to his sister. Father conceded he had not made any arrangements for day care in the event J.P. was returned to father's custody on the day of the hearing. Father was visiting J.P. twice a week. J.P. would run up to him at the beginning of the visits and

9

was happy to visit with father. Father believed he was bonded with J.P. and had a parent/child relationship with him.

Father's attorney requested the court continue the matter to allow father to provide the court with proof that mother had moved out and father had secured day care for J.P. The social worker, Johnnie Fountain, testified father gave her the name of father's sister but failed to provide her telephone number or address. Fountain also testified father told her he would move out of the family home and arrange for day care for J.P. but "never followed through." J.P. was currently in an excellent foster home. He had been there for about 30 days.

The trial court found that, although father had substantially complied with his case plan and loved J.P., father had been unable to choose J.P. over mother, and do what was necessary to regain custody of J.P. The court did not find father's testimony credible. The court concluded it could not safely return J.P. to father's custody and ordered J.P. to remain in out-of-home placement. The court further terminated mother and father's reunification services and set the section 366.26 hearing.

**Section 388 Petition and Section 366.26 Hearing**

In DPSS's section 366.26 report, filed in September 2012, DPSS requested a 30-day continuance of the section 366.26 hearing in order to complete the preliminary adoptions assessment and identify prospective adoptive parents for J.P. J.P. had been in foster care for the past two years, with two placements. Father continued to reside with mother. He was passive towards mother and remained her primary support. Father was understanding and sympathetic regarding mother's mental health struggles but also

10

enabled her problem behaviors. Father remained bonded with J.P. and J.P. enjoyed playing with father during his visits but, according to J.P.'s foster mother, J.P. "has not wanted to have the visits with his parents and he was not able to convey why he did not want to have a visit with them." J.P. changed placements in April 2012 and was doing well in his current foster home. J.P.'s current caregivers were not able to adopt J.P.

DPSS concluded mother and father had not addressed the issues that lead to the juvenile dependency proceedings. Their family situation had not stabilized and continued to be a health and safety concern for J.P., as it had been when the juvenile dependency proceedings began. DPSS concluded J.P. was adoptable but no prospective adoptive parents had been identified. The juvenile court continued the section 366.26 hearing.

In November 2012, DPSS filed an addendum report stating that since the last hearing in September 2012, mother and father had not made significant progress or changed their living situation. Father had not provided a safety plan for reuniting with J.P. nor demonstrated he was able to provide proper care for his son. DPSS noted that a few days before the last hearing, father provided a letter indicating he had moved to a one-bedroom apartment and was living there alone. Since then, father failed to provide information substantiating this change or that the change would provide a safe and healthy environment for J.P. Father had not established that he was able to provide for two households, mother's and his own with J.P.

J.P. had recently been placed in a prospective adoptive home and was adjusting well to his new family. J.P.'s foster mother reported that all of father's visits and phone calls with J.P. were done with mother. There was no indication mother and father were

living separately. J.P.'s foster mother noted that J.P. seemed not to want to speak with mother and preferred spending more time with father than mother. The social worker stated in the November 2012 addendum report that DPSS had sent correspondence to the addresses provided for mother and father, and the letters were returned unclaimed, with the stamp, "Attempted – Not Known Unable To Forward." The social worker also reported that mother and father's phones were disconnected. DPSS recommended terminating parental rights and placing J.P. for adoption.

DPSS attached to its addendum report a preliminary assessment report of J.P.'s prospective adoptive parents. The report stated that J.P. had been living with his prospective adoptive family since October 29, 2012. He was five years old, had begun kindergarten, and appeared to be a happy, well-adjusted child. J.P. was bonding with his prospective adoptive parents, who wanted to adopt him and were committed to providing him with a stable, permanent, loving home.

On December 4, 2012, father filed a section 388 petition, requesting the juvenile court change its May 31, 2012 order terminating reunification services and setting a section 366.26 hearing. Father alleged in his petition there were changed circumstances, consisting of father maintaining suitable housing and no longer living with mother or maintaining a relationship with her. Father also alleged he had secured appropriate child care for J.P. while father was working. Father requested the court place J.P. with him on family maintenance or order reunification services and vacate the section 366.26 hearing. Father believed granting his section 388 petition was in J.P.'s best interests because father had maintained close contact with J.P., father shared a strong bond with him, and

12

returning J.P. to father would strengthen their bond and relationship. Attached to father's petition were photographs of his apartment kitchen and a bedroom decorated for J.P.

In response to father's petition, DPSS filed an additional addendum report recommending that DPSS deny father's petition. DPSS noted that the juvenile court had continued the section 366.26 hearing three times, initially to allow for the preliminary adoption assessment to be completed, and then a second and third time because mother was hospitalized. On November 29, 2012, the social worker spoke to mother on the telephone. When asked for the name of the hospital and her current residence address, mother did not provide the information, other than stating she was living in Fontana. This concerned DPSS because this was where father said he was living. Mother's adult daughter, Elizabeth, said they did not know mother's address because mother had just moved within the past week or two. During the telephone conversation, mother spoke about her relationship with father as not being separated. She said she and father were working to have the court return J.P. to their care. She added that they were a family and needed to be together. However, mother's attorney told the court that mother was not living with father. Counsel told the court: "I can guarantee that. I have spoken to my client several times, and I speak with her current caretaker on the phone, too, and that is not where [mother] lives."

When the social worker spoke to father on December 4, 2012, father said he did not know about mother's current condition because they were separated. On December 10, 2012, father arrived at the DPSS office with his sister and her four children, and said mother was on her way there. When he was told his visit with J.P. would include only

father and J.P., father became upset and said his wife was on her way there, and she should be able to see J.P. When mother showed up, she appeared to be very intoxicated. Everyone, other than father and J.P., was told to leave because the visit was only with father and J.P. Although father initially told the receptionist at the DPSS office that he and mother were together, after visiting with J.P., father made a point of telling the receptionist that, even though mother was waiting for him outside the office, he and mother were separated. The social worker believed, based on her observations, that mother and father were "a team and still in a relationship." Neither mother nor father provided DPSS with mother's address in Fontana, and neither were forthcoming as to mother's current status. DPSS further reported that J.P. had been placed in an adoptive home, and appeared happy and comfortable there.

The section 388 petition was heard on December 17, 2012, the same day as the section 366.26 hearing. Father testified he was not living with mother, was no longer in a relationship with her, and was not supporting her financially. Father stated he recently moved to Fontana and had not had any recent contact with her. Father's new apartment had a furnished and decorated bedroom for J.P. Mother's sister supported mother. According to father, mother did not live in Fontana. Father said he had separated from mother and intended to divorce her in order to provide J.P. with a safe home. Father had not filed for a divorce yet. Father testified that, if J.P. was returned to him, J.P. would receive child care at Kinder Care in Fontana while father was at work from 7:00 a.m. to 3:30 p.m.

14

Father said he had completed his case plan, had stable employment, and had been visiting J.P. once a month. Before termination of reunification services, he visited J.P. twice a week. J.P. was happy during the visits. Mother and father visited J.P. together. J.P. called father "dad," ran up to him, and told father he loved him. J.P. told father he wanted to go home with him.

After considering the evidence, including testimony, and listening to argument, the juvenile court denied father's section 388 petition, finding that father's testimony was not credible and therefore father had not established changed circumstances. The court also found that granting the petition was not in J.P.'s best interests because J.P. had been placed in a permanent adoptive home with a loving family, J.P. was adjusting well and thriving there, and he had bonded with his adoptive parents.

After denying the section 388 petition, the juvenile court held a section 366.26 hearing. The parties agreed to incorporate the testimony provided during the hearing on the section 388 petition. Father's attorney requested legal guardianship, rather than adoption, and also requested the court apply the parent-child relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i). The juvenile court rejected father's requests and ordered parental rights terminated. The court found clear and convincing evidence that it was likely J.P. would be adopted, that reasonable services had been provided to mother and father, that the parent-child relationship exception did not apply, that termination of parental rights would not be detrimental to J.P., and that adoption was in J.P.'s best interest.

III

SECTION 388 PETITION

Father contends the trial court abused its discretion in denying his section 388 petition requesting the juvenile court to change its May 31, 2012, order terminating reunification services and setting a section 366.26 hearing.  Father argues he established there were changed circumstances of father maintaining suitable housing for J.P. and no longer living with mother or maintaining a relationship with her.  Father also secured appropriate child care for J.P. while father worked.

*A.  Applicable law*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child.  [Citation.]  The parent bears the burden to show both "'a legitimate change of circumstances'" and that undoing the prior order would be in the best interest of the child.  [Citation.]  The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.  [Citation.]"  (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

In evaluating whether parents have met their burden to show changed circumstances, the trial court should consider:  (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the

16

degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).) These factors become less significant once reunification services have been terminated, as in the instant case. This is because, "[a]fter the termination of reunification services, . . . 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

*B. Changed Circumstances*

Father argues that he met his burden of establishing the three factors showing changed circumstances under *Kimberly F., supra,* 56 Cal.App.4th at page 532, by establishing that (1) the seriousness of the problem leading to dependency was "on the less serious end of the spectrum," (2) there was a strong bond between father and J.P., and (3) father had resolved the problem by no longer residing with mother and arranging for child care.

As to the first factor, we disagree that the problem leading to J.P.'s dependency was relatively minor. The family was brought to DPSS's attention because of mother's mental health problems and because she was abusing drugs. This exposed J.P. to significant risks of harm, including mother allowing him on a regular basis to play unsupervised, outside in the middle of the night, while father slept. During the day, while father was at work, J.P. was also left at great risk in mother's sole care. On one occasion, mother passed out in the car, leaving J.P. unsupervised in the car for a lengthy period of time.

Father was well aware of mother's mental health problems and her abuse of prescription medications but nevertheless left J.P. in her sole care while father worked. Father was devoted to caring for mother and appeared to be unable to leave her permanently, even though J.P. was at risk of harm when left in her care. The seriousness of the problems leading to the juvenile dependency proceedings was therefore great.

As to the second factor, it is undisputed that there was a bond between J.P. and father, formed during the first three-and-a-half years of J.P.'s life, when he lived with mother and father. Father made an admirable attempt to maintain that bond by consistently visiting J.P. during the subsequent two-year period after J.P. was removed from mother and father's care. This bond was not sufficient to overcome the weight of the evidence demonstrating that father had not resolved the serious problems leading to J.P.'s removal from father's custody.

Father argues as to the third factor, regarding the nature or degree of the change of circumstances, that the juvenile court should have delayed denying his petition and terminating parental rights, at least briefly, in order to confirm that father's separation from mother was genuine. Father asserts that the court should have continued the proceedings, since there was evidence of his separation and J.P. had lived with his prospective adoptive family for only two months.

There was no abuse of discretion in the court rejecting any further delays because of the lengthy period of time the family had been receiving DPSS services for over three years. In addition, the juvenile court continued the section 366.26 hearing several times. The section 388 and section 366.26 hearings were not heard until over six months after

18

the court set the section 366.26 hearing. At the time of the section 388 petition hearing, father still had not demonstrated that he had permanently separated from mother and would protect J.P. if placed with father. The court therefore was reasonable in not delaying the proceedings any further.

Father argues that it was not until the 18-month hearing on May 31, 2012, that DPSS told him he had to move out of the family home and provide a plan for caring for J.P. on his own. Father claims he then complied with these requirements. He separated from mother, secured a new residence with a room for J.P., and arranged for child care while father was at work. Father contends that, based on these changed circumstances, the juvenile court abused its discretion in denying his petition. We disagree. There was no abuse of discretion in denying father's section 388 petition. Although it is undisputed father loved J.P. and bonded with him during the three and a half years J.P. lived with father, it was well established that the risk remained that father simply would not adequately protect J.P. from mother.

Assuming father and mother had not separated in May 2012, when the court terminated reunification services, the juvenile court did not abuse its discretion in denying father's section 388 petition because the court could reasonably conclude father had not established changed circumstances. First, father's credibility was suspect. At or shortly before the May 2012 hearing, father had informed the court that he was no longer living with mother, and his sister had agreed to provide child care for J.P. There was reason for the court to conclude this representation was false. Mother and father failed to provide any evidence at the May 2012 hearing confirming they were no longer living

19

together. Furthermore, at the hearing, father's attorney told the court father was willing to move out of the family home or have mother move out, thus indicating that, in fact, mother and father were actually still living together. At the May 2012 hearing, father also conceded he had not arranged for child care for J.P., in the event J.P. was returned to him at that time. On the other hand, if, at the time of the May 2012 hearing, father had actually separated from mother and had arranged for child care, then there were no changed circumstances at the time of the hearing on the section 388 petition.

Second, there was substantial evidence that at the time of the hearing on the section 388 petition, mother and father remained united as a married couple in their determination to regain custody of J.P., and it was highly unlikely that mother and father had permanently separated or intended to do so in the future. There was evidence that father was still very much attached to mother and it was not likely that father had severed his relationship with her, as he claimed. For over nine years, mother and father had been married. Father had been mother's sole support and had consistently provided mother with assistance with her problems and emotional support. Father and mother had regularly visited J.P. together. They both appeared at the DPSS office for a visit with J.P. on December 10, 2012, seven days before the hearing on the section 388 petition.

When the social worker told father mother could not attend the visit, father became upset and insisted on mother being permitted to participate. Father said his wife was on the way there and told the receptionist he and mother were together, indicating they had not separated. Later, after the visit, father made a point of emphasizing that, even though mother was waiting outside for him, they had separated. However, when the

20

social worker asked for mother's current address, neither mother nor father provided an address. The social worker reported that she believed, based on her observations, that mother and father were "a team and still in a relationship."

Although father stated in his section 388 petition and testified during the petition hearing that he had separated from mother and was going to divorce her, he had not filed for divorce and he had not provided corroborating evidence that mother was not living with him. In addition, the DPSS social worker stated in the November 2012 addendum report that DPSS sent correspondence to the addresses provided for mother and father and the letters were returned unclaimed with the stamp "Attempted – Not Known Unable To Forward." The social worker also reported that mother and father's phones were also disconnected. The trial court stated it was not convinced that mother was not living with father. This was partly because father and mother did not provide a valid new residence address for mother, and mother told DPSS she was living in Fontana, which was where father's new apartment was located.

Based on the totality of the evidence, it was reasonable for the court to conclude father had not permanently severed his relationship with mother, and that it was likely that, even if father had moved to a new apartment, mother was living with him or would do so in the future. Then, if J.P. was returned to father, once again J.P. would be left in mother's sole care and be at risk of harm.

Father's history of exposing J.P. to a risk of harm by leaving J.P. in mother's sole care, failing to take adequate measures to eliminate the risk expeditiously, and misrepresenting to the court at the May 2012 hearing that he was no longer living with

21

mother, provided a reasonable basis for the trial court to find that father's testimony was not credible and that circumstances had not permanently changed, such that there remained a risk that father would not adequately protect J.P.

## C. J.P.'s Best Interests

Father contends that granting his section 388 petition was in J.P.'s best interests because father had maintained close contact with J.P. and shared a strong bond with him. Returning J.P. to father would strengthen that bond and their relationship. We conclude the court reasonably found that it was not in J.P.'s best interests to grant father's section 388 motion and order additional reunification services, rather than terminating parental rights and proceeding with adoption. Although the evidence showed that J.P. and father had a strong bond, the evidence also supported a finding that there was a high probability that father had not permanently separated from mother and would likely continue his relationship with her, if not continue living with her, which would expose J.P. to significant risk of harm. Because J.P. needed stability and permanency, and father had failed to demonstrate that he would protect J.P. from serious harm, the juvenile court reasonably concluded it was not in J.P.'s best interest to delay any longer terminating parental rights and placing J.P. in a permanent home.

Even assuming, father's circumstances were changing, "'[a] petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] "'[C]hildhood does not wait for the parent to become adequate.'"' [Citation.]" (*In re Mary G.* (2007)

22

151 Cal.App.4th 184, 206.) Here, the court reasonably found it was not in J.P.'s best interest to grant father's section 388 motion and allow additional reunification services.

IV

BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION

Father contends the juvenile court erred in rejecting the parent-child relationship exception to termination of parental rights. We disagree.

*A. Applicable Law*

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *Ibid.*)

Under section 366.26, subdivision (c)(1)(B)(i), the parent-child relationship exception may apply when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th

23

567, 575 (*Autumn H.*) ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*); see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).) The juvenile court may consider the relationship between a parent and a child in the context of a dependency setting, but the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155-1156; *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

B. *Standard of Review*

California courts have disagreed as to the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. We agree with the view expressed in the recent decision, *K.P., supra,* 203 Cal.App.4th at pages 621-622, that "review of an adoption exception incorporates both

24

the substantial evidence and the abuse of discretion standards of review. [W]hether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citations.] This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*K.P., supra,* 203 Cal.App.4th at pp. 621-622, quoting *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We likewise apply the composite standard of review here.

*C. Discussion*

Father argues that terminating parental rights would deprive J.P. of a substantial, positive emotional attachment such that J.P. would be greatly harmed. J.P. was in mother and father's care for the first three and a half years of J.P.'s life. Father had a parent-child relationship with J.P. during this time, and after J.P. was removed from mother and father's home, father regularly and consistently visited J.P. The visits always went well. J.P. was happy to visit with father, hugged father, and called him "dad." The DPSS social worker reported several times that father appeared to be bonded with J.P. and J.P.

25

appeared to enjoy visiting with father. Father testified at the section 366.26 hearing that he also believed he was bonded with J.P. and had a parent/child relationship with him.

Despite the loving relationship father held with J.P., the trial court did not abuse its discretion rejecting the parent-child relationship exception, since the benefit of continuing father's relationship with J.P. was outweighed by the well-being and permanent stability J.P. would gain by J.P.'s prospective adoptive parents adopting J.P. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1253.) As noted in *Melvin A.*, the kind of parent-child relationship that must exist in order to trigger the parent-child relationship exception is not defined in any statute. (*Ibid.*) The court in *Melvin A.* explained that the relationship "'must be sufficiently strong that the child would suffer detriment from its termination.' [Citation.]" Continuing the parent/child relationship must promote ""the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." [Citation.]' [Citations.]" (*Melvin A.,* at pp. 1253-1254.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and

the child,[] and (4) the child's particular needs. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467; *Jasmine D., supra,* 78 Cal.App.4th at pp. 1349-1350.)

Here, father failed to demonstrate that he had maintained a substantial, positive emotional attachment or maintained a parental role such that terminating parental rights would greatly harm J.P. J.P. was young when he was removed from father's home, remained in foster care for two years thereafter, and ultimately was successfully placed in a prospective adoptive home. At the time of the section 366.26 hearing, J.P. had adjusted well to his placement in a loving, stable prospective adoptive home.

Father argues that, although J.P. was doing well in his prospective adoptive home at the time of the section 366.26 hearing, J.P. had only lived there for about two months. Therefore J.P.'s positive relationship with his prospective adoptive parents did not outweigh the harm J.P. would suffer from the court terminating father's relationship with J.P. We disagree. Father received over two and a half years of DPSS services, during which father failed to demonstrate that he had separated from mother and would protect J.P. by not leaving J.P. with mother. Meanwhile, J.P. was successfully placed in a loving, stable adoptive home and was doing well. Even though J.P. had lived in the adoptive home for only a relatively short period of time, there was no evidence that J.P. would not be happy in the home or would not be adopted by his prospective adoptive parents. The juvenile court reasonably found that continuing father's relationship with J.P. did not promote J.P.'s well-being to such a degree as to outweigh the well-being J.P. would gain in a permanent home with new, adoptive parents.

27

Father's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289, for the proposition the parent-child relationship exception applies is misplaced. *S.B.* is distinguishable in that, in *S.B.*, an evaluator conducted a bonding study and testified at the section 366.26 hearing that, because S.B.'s father's relationship with S.B. was fairly strong, there was a potential for harm to S.B. were S.B. to lose the parent-child relationship. (*S.B.,* at pp. 295-296.) Here, there was no bonding study or related expert testimony establishing that J.P. would suffer significant harm by terminating father's parental rights.

We conclude the court did not abuse its discretion in rejecting the parent-child relationship exception. Father has not established that this is an extraordinary case in which preservation of his parental rights must prevail over J.P.'s need for a stable, permanent home and the Legislature's preference for adoptive placement. (*Jasmine D., supra,* 78 Cal.App.4th at p. 1350; see also *K.P., supra,* 203 Cal.App.4th at p. 621.)

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

KING
J.

28